In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 24-1914

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANDREI TAYLOR,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cr-00510-1 — **John J. Tharp, Jr.**, *Judge.*

_____

ARGUED SEPTEMBER 4, 2025 — DECIDED DECEMBER 3, 2025

_____

Before BRENNAN, *Chief Judge*, and KOLAR and
MALDONADO, *Circuit Judges*.

BRENNAN, *Chief Judge*. As Andrei Taylor ran from police,
he tossed a loaded gun over a fence into a backyard. He later
pleaded guilty to being a felon in possession of a firearm. 18
U.S.C. § 922(g)(1). The government sought to enhance Tay-
lor's sentence under U.S. Sentencing Guideline § 3C1.2 for
recklessly endangering others when he threw the gun. The
government also believed Taylor had previously used the gun

in furtherance of a murder, so it asked the district court to apply a higher base offense level to calculate the sentence under Guideline § 2K2.1(c).

The district court agreed with the government and sentenced Taylor to 15 years in prison—the statutory maximum. On appeal, Taylor argues neither the enhancement nor the elevated base offense level should apply to him. He also claims the sentence was substantively unreasonable. Because his arguments are unpersuasive, we affirm the district court.

## I.

### A. Facts

The issues in this appeal implicate a murder and a police chase that occurred on separate dates in September 2022.

*The murder.* Taylor was a member of the Cali Boys, a gang that promoted their ability to kill their "opps" (opponents). Kadaivion Jones was a member of the Gangster Disciples, a rival gang of the Cali Boys.

On September 2, Kevon Bonner, a fellow Cali Boy, picked up a stolen white Dodge Durango SUV from a repair shop. From about 6:02 p.m. to 6:23 p.m., cell phones associated with Taylor, Bonner, and Quincy Phillips—a third Cali Boy— "pinged," that is, sent to or received signals from a nearby cell tower. Although such communications do not reveal the exact location of the phone or who held it, the three phones all pinged the same tower for about 20 minutes.

At 6:24 p.m., video captured the same Dodge Durango and a Chrysler 300 sedan traveling in tandem in a direction away from the cell tower. At 6:29 p.m., Taylor's and Bonner's phones both pinged a tower located about 500 meters from where

Jones was killed. Just after those communications stopped, video recorded the cars approaching Jones while he walked down a sidewalk. The two cars pulled up to Jones. At least one person shot a gun from the passenger side of the Chrysler, and at least two people exited the Dodge and fired shots at Jones. The shots continued to strike Jones as he tried to get up from the ground and escape. Police later recovered some 9mm shell casings from the scene. Jones died en route to the hospital from multiple gunshot wounds.

Minutes after the shooting, Taylor went online to post about it and look for related news. Around 6:41 p.m., Taylor posted a Facebook status, stating "Ooowwww." Then he searched Facebook for "Kadaivion Jones." Later that night, Taylor posted, "I'm so happy I ain't got no opp cousins 'cause I be all over they ass." He also searched for Facebook accounts that post news of murders and other crimes in Chicago. This was not the first time Taylor searched Facebook for Jones and a shooting. A week before, shots were fired at Jones and his girlfriend, and Taylor searched Facebook for "Kadaivion Jones."

A few hours after Jones's murder, Bonner was arrested while driving the same Chrysler from the videos. DNA, fingerprints, and a paper trail tied Bonner to evidence recovered from the Chrysler and the Dodge. Hours later, Taylor sent several messages in a group chat, urging people to start a new group chat because the police now had Bonner's phone.

*The police chase.* On September 19, three armed men stole a car at gunpoint. When police caught up to the stolen car and flashed their lights at it, four men sprang out of the car and fled. Taylor, first out of the car, bolted into a neighborhood. As he ran through the streets, he tossed a loaded 9mm Glock

pistol over a fence into a backyard. Shortly afterward, police detained Taylor and recovered the gun.

A grand jury indicted Taylor for possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1). Taylor pleaded guilty pursuant to a written plea agreement. It anticipated a sentencing guidelines range of 46 to 57 months, depending on the application of a reckless-endangerment enhancement.

### B. Sentencing

Sentencing Guideline § 2K2.1 applies to the offense of felon in possession of a firearm under § 922(g)(1). *United States v. Jones*, 313 F.3d 1019, 1021–22 (7th Cir. 2002). The base offense level here was 20 because the crime involved a semi-automatic firearm capable of accepting a large capacity magazine, and Taylor's prior felonies prohibited him from possessing a firearm. U.S. SENT'G GUIDELINES MANUAL § 2K2.1(a)(4)(B). In its presentence investigation report ("PSR"), the probation office added a two-level enhancement for reckless endangerment because Taylor fled from the police in a residential neighborhood and threw a loaded firearm into a homeowner's backyard. *See* U.S.S.G. § 3C1.2. After a three-level decrease because Taylor accepted responsibility, the total offense level was 19. The PSR did not mention any murder allegations.

After the PSR was completed, but before sentencing, the government informed defense counsel of evidence linking Taylor to the Glock used in Jones's murder. The parties agreed to delay submitting sentencing memoranda so the government could produce discovery relating to Jones's murder. Based on that new evidence, the government asked the court to calculate the sentence by cross-referencing a higher

base offense level under the homicide Guidelines. Instead of using the base offense level of 20 for a felon-in-possession violation, the government argued for a base offense level of 43 for first-degree murder because the new evidence showed that Taylor participated in the killing of Jones.

Taylor objected. To him, the reckless-endangerment enhancement did not apply. And the higher base offense level for murder should not be used. He argued that because Illinois could still prosecute him for that crime, it would be unfair to hold him accountable for murder based on evidence subject to weaker procedural protections and on a lesser standard of proof. So to Taylor, his sentencing guideline range—without the enhancement and the increased offense level—should run from 37 to 46 months.

Over the course of three sentencing hearings, the district court examined expert testimony, witness interviews, shell casings recovered from the murder scene, cell tower information, surveillance footage, and Taylor's Facebook activity. Based on a preponderance of the evidence, the district court concluded that Taylor was culpable in the murder of Jones. But the court declined to find that Taylor fired one of the murder weapons. The court then asked the parties to brief whether the § 2K2.1(c) cross-reference could be applied without a finding that Taylor possessed the Glock during the murder.

After the parties' briefing and arguments, the district court applied the § 2K2.1(c) cross-reference, reasoning that Taylor was "accountable for the possession of the Glock during that murder because he was an aider and abettor in that murder." For the reckless-endangerment enhancement, the court found that when Taylor tossed the gun over the fence, he did not

know where the police were, whether anyone was in the back-yard, or where the gun would land. Neither was there a basis for the court to infer anything about the gun's safety features. Taylor was reckless in not knowing any of these things, so the court applied the § 3C1.2 enhancement. The court then considered the sentencing factors under 18 U.S.C. § 3553(a), including the need to impose a sentence reflecting the seriousness of the offense, promoting respect for the law, deterrence, and protecting the public. After weighing these factors, the court imposed the statutory maximum sentence of 15 years. Taylor timely appeals.

## II.

Taylor raises three arguments on appeal. First, he challenges the base offense level used in his sentence calculation, contesting the court's decision to apply § 2K2.1(c)'s cross-reference to the first-degree murder Guidelines. Second, he claims the district court erred by applying the Guidelines enhancement under § 3C1.2 for reckless endangerment during flight from law enforcement. Third, he argues the court abused its discretion by imposing a substantively unreasonable sentence of 15 years, the maximum penalty.

We review the district court's application of the Sentencing Guidelines de novo. *United States v. Shehadeh*, 127 F.4th 1058, 1064 (7th Cir. 2025). Challenges to the court's underlying factual determinations are reviewed for clear error. *Id.* The clearly erroneous standard is deferential, and we will not disturb the district court's findings unless, after examining the evidence and the reasonable inferences, "we are left with the definite and firm conviction that a mistake has been made." *United States v. Ford*, 22 F.4th 687, 691 (7th Cir. 2022) (citation

No. 24-1914                                                          7

modified).

To consider Taylor's first argument about the accuracy of the base offense level and application of the cross-reference, we briefly review some concepts and definitions.

### A.  The Sentencing Guidelines

At sentencing, "the district court's obligation is simply to calculate the guidelines range correctly and arrive at a reasonable sentence after weighing the sentencing factors in § 3553(a), varying upward or downward from the guidelines range in its discretion." *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013). The Guidelines provide a three-step procedure for districts courts to follow when calculating the guidelines range. First, the court decides the applicable guideline section based on the charged offense. *See* U.S.S.G. §§ 1B1.1(a)(1), 1B1.2. Next, the court determines the base offense level, and applies specific offense characteristics, cross-references, and special instructions. U.S.S.G. § 1B1.1(a)(2). Then, the court "[a]ppl[ies] the adjustments as appropriate related to victim, role, and obstruction of justice from Parts A, B, and C of Chapter Three." U.S.S.G. § 1B1.1(a)(3). While this framework is "advisory and cannot mandate a strict decision-making sequence," the "adherence to § 1B1.1 facilitates consistency in sentencing and permits appellate courts to follow the sentencing court's reasoning in imposing a particular sentence." *United States v. Pankow*, 884 F.3d 785, 793–94 (7th Cir. 2018).

A cross-reference is an instruction to apply the offense level from another Guideline, rather than the one provided by the Guideline of the cited offense. U.S.S.G. § 1B1.5(a). It "authoriz[es] a sentencing court to look to other guidelines

provisions to impose a higher sentence on an offender under certain circumstances." *Jones*, 313 F.3d at 1022. Such references may be used only if it results in a greater offense level. U.S.S.G. § 1B1.5(d). By contrast, an offense-level enhancement is added to the base offense level to reflect the defendant's conduct during the offense. *See* U.S.S.G. § 3C1.2. cmt. n.5. After adjusting for the defendant's acceptance of responsibility and criminal history, the court determines the guideline range "that corresponds to the offense level and criminal history category." U.S.S.G. § 1B1.1(a)(7).

Taylor was charged as a felon in possession of a firearm under § 922(g)(1). The PSR, which did not consider any evidence related to the murder, calculated the base offense level as 20. But after the introduction of the murder evidence, the district court applied a cross-reference to the first-degree murder guideline resulting in a base offense level of 43. Then, the court applied a 2-level enhancement under § 3C1.2 for reckless endangerment during flight, bringing the adjusted offense level to 45. Finally, the court agreed with the PSR's recommendation to apply a 3-level reduction for Taylor's acceptance of responsibility. This brought the final offense level to 42. Based on Taylor's criminal history category of IV, and offense level 42, his Guideline range was 30 years to life, but the statutory cap set a 15-year maximum sentence.

### B. § 2K2.1(c) Cross-Reference

U.S.S.G. § 2K2.1, which governs felon-in-possession convictions, provides for a higher base offense level by cross-referencing the murder Guideline, § 2A1.1. When deciding whether a cross-reference is appropriate, a court must consider whether the uncharged offense is "relevant conduct" to the charged offense. U.S.S.G. § 1B1.3; § 2K2.1(c)(1)(B).

Essentially, a court is authorized to consider uncharged conduct from "events before, during, and after the offense conduct." *United States v. Ritsema*, 31 F.3d 559, 567 (7th Cir. 1994). If the relevant conduct guideline allows for the application of a cross-reference, the sentencing court may then apply a higher base offense level from the analogous offense guideline. *See Jones*, 313 F.3d at 1022. A homicide cross-reference may apply when the firearm cited in the felon in possession offense was also used or possessed in connection with another offense which resulted in death. U.S.S.G. § 2K2.1(c)(1)(B).

    1. *The text of § 2K2.1(c)*

Our interpretation of § 2K2.1 begins and ends with the text of the Guideline. The Sentencing Guidelines provide that a defendant may receive a higher sentence if he "used or possessed any firearm" in violation of § 922(g)(1) to commit "another offense" resulting in death. U.S.S.G. § 2K2.1(c)(1). In deciding the other "offense" to which § 2K2.1 refers, courts must find "the most analogous offense" from the homicide guideline section. U.S.S.G. § 2K2.1(c)(1)(b). Once found, the Guideline from that offense is used to determine the new base offense level. *Id.* For the cross-reference to apply, the firearm used in the charged crime must also have been used in the commission of the other crime. U.S.S.G. § 2K2.1(c)(1) cmt. n.14(E). The firearm Taylor possessed in violation of § 922(g)(1) must have been the same firearm used in the murder.

There is another step. In applying the cross-reference, courts must ask if the uncharged act was "relevant conduct" to the charged offense. *See, e.g.*, *Jones*, 313 F.3d at 1022; *United States v. Galvan*, 44 F.4th 1008, 1011 n.1 (7th Cir. 2022) (citing

*Jones*, 313 F.3d at 1021–1022). Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A).

At the final sentencing hearing, the district court correctly concluded that § 2K2.1(c)'s cross-reference applies if "the defendant possessed that firearm … in connection with … the commission of another offense." *See* U.S.S.G. § 2K2.1(c)(1). The court then found that the firearm possession during the flight from police was (1) the same offense as the firearm possession on the day of the murder, (2) repeated and regular throughout the 17-day period between the offenses, and (3) within a brief interval of time (well within the 8-month window described in § 2K2.1 Application Note 14(E)). Thus, all the factors supported the court's conclusion that the uncharged firearm possession on September 2 was part of the same course of conduct as the charged possession on September 19. Accordingly, the gun possession on September 2 was relevant conduct under § 2K2.1(c).

Taylor argues § 2K2.1(c)'s cross-reference cannot apply for three reasons. First, the text of § 2K2.1(c) does not explicitly apply agency principles in this context. That is true. But Application Note 14(E) to § 2K2.1 requires considering § 1B1.3's relevant conduct provisions, which include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." *Jones*, 313 F.3d at 1023 (quoting U.S.S.G. § 1B1.3(a)(1)(A)). Similarly, the Application Notes to § 1B1.3 address accomplice and conspiracy liability. *See* U.S.S.G. § 1B1.3 cmt. nn.3–4. Further, § 1B1.3 Application Notes 3 and 4 call for the consideration of "jointly undertaken criminal

activity" as relevant conduct. Thus, for firearms offenses under § 2K2.1, relevant conduct includes all acts that arise out of the same course of conduct or common scheme or plan as the charged offense. *See, e.g.*, *Jones*, 313 F.3d at 1023; U.S.S.G. § 2K2.1(c)(1) cmt. n.14(E); *United States v. Harper*, 766 F.3d 741, 747 (7th Cir. 2014) (finding the firearm possession for a weapon also in the defendant's possession hours earlier during drug sales fell within the scope of relevant conduct). The text of the Guidelines supports the consideration of agency principles by recognizing aiding and abetting liability, as well as coconspirator liability.

Second, Taylor submits § 2K2.1(c)'s specific requirement that "the defendant used or possessed any firearm or ammunition cited in the offense of the conviction" limits the reach of § 1B1.3's relevant conduct principles. Yet this court has consistently affirmed sentence enhancements based on agency or accomplice liability, even when the underlying Guidelines provisions do not explicitly state such liability. *See, e.g.*, *United States v. Jones*, 900 F.3d 440, 445, 449 (7th Cir. 2018) (finding no error where the district court enhanced a drug sentence under § 2D1.1(b)(1) based on a theory of conspirator liability); *United States v. Bey*, 748 F.3d 774, 778 (7th Cir. 2014) (same under § 2B3.1(b) because it was reasonably foreseeable to defendant that armed robbery coconspirator would possess gun). Although § 2K2.1(c) is a cross-reference, § 2K2.1 Note 14(E)'s requirement of applying relevant conduct principles cuts against excluding agency liability under § 1B1.3 for cross-references but including it for enhancements.

Third, Taylor attempts to limit the applicability of § 2K2.1(c)'s text through analogies to other Sentencing Guidelines. He claims the text of § 2K2.1(c) ("[i]f the defendant used

or possessed any firearm") more closely resembles the active voice of § 5C1.2(a)(2) than the passive voice of § 2D1.1(b)(1).[1] He contends the use of the passive voice means that who possessed the firearm during an offense does not matter. Yet the use of the active voice, like in § 2K2.1(c), requires that the charged defendant possessed the gun.

But the text of § 2K2.1(c) refutes this argument. Although Application Note 2 to § 5C1.2 limits a defendant's liability to "his own conduct and conduct that he aided or abetted," Application Note 14(E) to § 2K2.1(c) includes no such limitation. *Compare* U.S.S.G. § 5C1.2 cmt. n.2, *with* U.S.S.G. § 2K2.1 cmt. n.14(E). And even under § 5C1.2, a defendant is liable for "conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 5C1.2 cmt. n.2. Thus, § 5C1.2 incorporates the same kind of aiding and abetting liability Taylor attempts to deny.

Application Note 14(E) to § 2K2.1(c) also requires a court to consider the relevant conduct principles under § 1B1.3(a). The district court met this requirement at the final sentencing hearing. There, it correctly stated that the commentary to § 1B1.3(a)(1) expressly includes the relevance of aiding and abetting and *Pinkerton* liability to decide whether conduct is relevant.[2]

---

[1] *Compare* § 5C1.2(a)(2) ("the defendant did not … possess a firearm"), *with* § 2D1.1(b)(1) ("if a dangerous weapon [including a firearm] was possessed").

[2] *Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946) (holding that defendants are liable for reasonably foreseeable criminal acts of coconspirators if such acts were in furtherance of the conspiracy).

In sum, Taylor asks the court to diverge from Application Note 14(E)'s requirement because "the application of relevant conduct principles can vary based on the text of [the] [G]uideline involved." That may be so. But when § 1B1.3 demands consideration of relevant conduct based on the similarity, regularity, and time interval of the offenses, we follow the text as written.

### 2. *Actual possession*

The district court applied the cross-reference here because Taylor possessed the firearm in connection with the commission of another offense—the murder of Jones. Although the court did not find that Taylor "personally had the Glock during the course of the Jones murder," it found Taylor "accountable for the possession of the Glock" as "an aider and abettor and a coconspirator."

The two offenses shared relevant conduct. Both the charged and uncharged offenses were for episodes of firearm possession, the possession was repeated and regular, and the interval between the offenses was brief.[3] Thus, the court found the firearm possession on September 2 to be relevant to the firearm possession on September 19, or at least part of the same course of conduct. Accordingly, § 2K2.1(c)(1) applied. The court concluded "the base offense level is, therefore,

---

[3] In the example in Application Note 14(E), a defendant is convicted of unlawful possession of a shotgun on October 15. U.S.S.G. § 2K2.1 cmt. n.14(E). The district court finds the defendant possessed and used the same shotgun to commit a robbery on the preceding February 10, eight months earlier, creating a relevant conduct bridge between the events. *Id.* Accordingly, the February unlawful possession is part of the same course of conduct as the October unlawful possession, and the cross-reference applies. *Id.*

drawn from Section 2A1.1(a), the first[-]degree murder sentencing guideline, rather than the base offense level set out in 2K2.1."

Even beyond the text of § 1B1.3's relevant conduct provisions, this court has applied both conspiracy and aiding and abetting liability principles for firearm possession offenses. We have decided a defendant was liable under § 922(g)(1) for the use and possession of guns used in a robbery, despite only "meager" evidence of personal possession because he helped his coconspirators plan that robbery. *United States v. Conley*, 875 F.3d 391, 400–01 (7th Cir. 2017) (affirming a finding of liability under a *Pinkerton* theory because the "use of firearms was an essential part of the plan, … within the conspiracy's scope, and therefore foreseeable" to the defendant).

We have also concluded that aiding and abetting liability existed under a *Rosemond* theory[4] when a defendant did not personally possess a gun, but (1) participated in a joint criminal activity, (2) sought to promote the objective, and (3) knew a coconspirator possessed a gun. *See United States v. Newman*, 755 F.3d 543, 545 (7th Cir. 2014) (citing *Rosemond v. United States*, 572 U.S. 65, 78 (2014)). For that reason, this court has consistently recognized aiding and abetting liability in the application of § 2K2.1(c)(1). *See, e.g.*, *Newman*, 755 F.3d at 545; *Conley*, 875 F.3d at 401. Here, the district court found that a participant in the September 2 murder used the gun that Taylor was charged with possessing on September 19. Because

---

[4] *Rosemond v. United States*, 572 U.S. 65, 67 (2014) (holding that aiding and abetting liability requires a defendant to "actively participate" in the violent crime with "advance knowledge" that an accomplice will "use or carry a gun during the crime's commission").

Taylor had advance knowledge that the same firearm would be used on September 2, he is liable under a *Rosemond* theory.

The court also found the murder to be "planned and precisely calculated" because "[a]ll the participants clearly knew the plan, and … executed it perfectly." No record evidence suggests otherwise. Under our precedent, the district court did not have to make a particularized finding of actual possession. Thus, Taylor possessed the relevant firearm for the purposes of § 2K2.1(c)(1).

For all these reasons, the district court adeptly and correctly calculated Taylor's sentencing guidelines range, and we reject Taylor's challenge to the contrary.

### C. § 3C1.2 Reckless Endangerment

Next, we turn to Taylor's second argument that the district court erroneously applied the sentencing enhancement for reckless endangerment under U.S.S.G. § 3C1.2. The "[a]pplication of a reckless-endangerment adjustment is a factual finding that we review for clear error." *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003).

A two-level sentencing enhancement is warranted when "the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. A defendant acts recklessly under § 3C1.2 when he is "aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 3C1.2 cmt. n.2 (incorporating "reckless" as defined by § 2A1.4 cmt. n.1). "To obtain the adjustment the government must show that the

defendant did more than merely flee; the guideline requires additional conduct that creates a substantial risk of serious injury." *Lard*, 327 F.3d at 553 (citation modified).

Taylor groups gun cases finding reckless endangerment under § 3C1.2 into four categories: (1) risks to bystanders created by police pursuit;[5] (2) risks of accidental discharge of the firearm by the fleeing person;[6] (3) risks of accidental discharge from a tossed firearm;[7] and (4) risks of a child or other non-responsible party finding a discarded firearm.[8] He submits this case does not present any of these elevated-risk scenarios.

First, Taylor claims there was no "significantly heightened risk" that his conduct would cause the police to fire their weapons because the police were not pursuing him when he possessed the Glock and no police officer saw him with a firearm. Consequently, "there was no moment in this case when any police officer ever had to decide […] whether to draw and fire their weapons." Second, Taylor claims there was little risk he would accidentally discharge the Glock because when he held the gun, he was "effectively alone" and gripped the gun only briefly by the magazine to toss it. Third, the Glock's "Safe Action System" was designed to prevent accidental discharges when dropped. Fourth, Taylor argues he tossed the gun in an isolated part of a backyard where it took several

---

[5] *See, e.g.*, *United States v. Easter*, 553 F.3d 519, 522 (7th Cir. 2009); *United States v. Brooks*, 100 F.4th 825, 836–37 (7th Cir. 2024).

[6] *See United States v. Shivers*, 56 F.4th 320, 325–326 (4th Cir. 2022).

[7] *See, e.g.*, *Brooks*, 100 F.4th at 835–36; *Lard*, 327 F.3d at 552–54.

[8] *See Lard*, 327 F.3d at 553 (citing *United States v. Brown*, 314 F.3d 1216, 1221 (10th Cir. 2003)).

minutes for officers to find the gun, even after watching footage of the gun being tossed.

At the final sentencing hearing, the district court made a series of factual findings and rejected each of Taylor's arguments. Taylor did not know where the police were. And he did not know whether anyone was in the backyard when he tossed the gun over a tall, non-transparent fence. There could have been adults or children in the backyard not visible to him running down the sidewalk. Further, there was "no basis" to infer Taylor knew anything about the Safe Action System nor whether the system would "necessarily prevent a trigger pull on a gun […] thrown into a yard." Last, Taylor did not "know the gun [would] land in a hard-to-access spot." The court found that Taylor was reckless "in not knowing any of these things." All these findings are afforded substantial deference, so we conclude that the court correctly applied the enhancement.

Taylor claims the district court's factual findings fail to meet the criteria established by previous rulings of this court. Taylor points to *Lard*, which states, "the government must show that the defendant did more than merely flee; the guideline requires 'additional conduct' that creates a substantial risk of serious injury." 327 F.3d at 553 (quoting *United States v. Reyes-Oseguera*, 106 F.3d 1481, 1483 (9th Cir. 1997); *see also United States v. Hagan*, 913 F.2d 1278, 1284–85 (7th Cir. 1990)).

But Taylor's arguments fall short for several reasons. The sentencing court's factual findings are afforded substantial deference. *Brooks*, 100 F.4th at 833. "The task on appeal is not to see whether there is any view of the evidence that might undercut the district court's finding; it is to see whether there is any evidence in the record to support the finding." *Id.*

(quoting *United States v. Wade*, 114 F.3d 103, 105 (7th Cir. 1997)). Record evidence supports each of the court's findings here. Taylor knew he "toss[ed] a loaded gun into the backyard of a resident," even though he made the situation slightly safer as he was no longer armed. Still, the § 3C1.2 enhancement applies even when a defendant makes an extremely reckless situation less reckless.

This court has applied the enhancement under § 3C1.2 when the defendant pulled out a gun while fleeing from the police, regardless of whether the police saw the gun. *United States v. Brown*, 716 F.3d 988, 996 (7th Cir. 2013) (applying enhancement because "brandishing of the gun during … flight presented a substantial risk that an officer arriving on the scene might discharge his gun in defense"); *United States v. Ingram*, 40 F.4th 791, 796 (7th Cir. 2022) (citing *Easter*, 553 F.3d at 524) ("Just reaching for a gun while fleeing is sufficient to trigger" enhancement, especially when officers are closing in on the defendant.). Taylor attempts to distinguish this case from other reckless endangerment cases with "more egregious facts." But his conduct was still reckless, even if less so than the defendants in other cases.

The district court's factual findings here are sufficient to support the § 3C1.2 enhancement. Thus, we reject Taylor's second argument and conclude that the enhancement was properly applied.

### D. Substantive Reasonableness

Third, Taylor argues he received a substantively unreasonable sentence.

We review the substantive reasonableness of a sentence for an abuse of discretion. *United States v. White*, 126 F.4th

1315, 1323 (7th Cir. 2025). "'We do not ask what sentence we would impose; we ask whether the district judge imposed a sentence for logical reasons that are consistent' with the factors enumerated in § 3553(a)." *Id.* (quoting *United States v. Campbell*, 37 F.4th 1345, 1352 (7th Cir. 2022)). This places a "heavy burden" on the challenger. *United States v. Kowalski*, 103 F.4th 1273, 1280 (7th Cir. 2024) (quoting *United States v. Creek*, 95 F.4th 484, 492 (7th Cir. 2024)). As a result, a sentence within the properly calculated Guidelines range is granted even greater deference and presumed reasonable. *Id.* (citing *United States v. Taylor*, 907 F.3d 1046, 1051 (7th Cir. 2018)).

At the final sentencing hearing, the district court detailed its consideration of the § 3553(a) factors. It discussed the nature and circumstances of the crime, including the aggravating factors. The court acknowledged Taylor's culpability for the murder, even if it was uncertain that Taylor was one of the shooters. It discussed Taylor's past three convictions for unlawful firearm possession and the "enormous risk of recidivism." And though Taylor attempts to claim otherwise, the court considered certain mitigating factors, including Taylor's family history, childhood upbringing, and physical and mental health. Finally, the court rejected Taylor's tail-wagging-the-dog argument, remarking that this court has consistently affirmed sentences based on conduct that satisfied only a preponderance of evidence standard. *See, e.g.*, *United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006); *United States v. Mitchell*, 635 F.3d 990, 993, 995 (7th Cir. 2011); *United States v. Valdez*, 739 F.3d 1052, 1054 (7th Cir. 2014); *Harper*, 766 F.3d at 746.

Based on facts in the record, the district court found "by a preponderance of the evidence, … Taylor was culpably involved in the murder of … Jones." The court acknowledged

that even if Taylor's possession of one of the murder weapons 17 days later was "certainly probative" that Taylor was one of the shooters, the court was "not prepared to make a finding by a preponderance of the evidence" on that fact. We conclude that as part of the district court's § 3553(a) analysis, it properly considered Taylor's participation in Jones's murder rather than improperly rely on the murder as the chief motivation for the sentence. The district court emphasized that Taylor was "being sentenced for the danger that he presents to the public and the danger he presented to the public on September 19 and as evident by his conduct on September 2 in engaging in the relevant conduct that he engaged in." It also found that "Taylor represent[ed] a substantial risk to the … safety of the public" and "[i]t [was] clear that a much more serious sentence needs to be imposed in order to achieve the objectives of sentencing set out in Section 3553(a)."

Taylor challenges the substantive reasonableness of the sentence on three grounds. First, the murder cross-reference was not incorporated into the PSR, so Taylor received no notice of its application—only after the PSR was prepared did the government procure evidence of the murder. But the court rejected the PSR's calculation because information about the homicide was not incorporated. And at the change of plea hearing, the court told Taylor his sentence could be up to a 15-year maximum. Further, Taylor's plea agreement about one year before the sentencing hearing stated: "further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply in this case."

Taylor next raises the Supreme Court's hypothetical in *Blakely v. Washington*, 542 U.S. 296 (2004). That case involved

state, rather than federal, sentencing law. *Id.* at 299. The primary claim in that case was a Sixth Amendment jury right claim, not a challenge to the substantive reasonableness of the sentence. *Id.* at 301. The facts admitted in the guilty plea in *Blakely* could not sustain the higher sentence, and the sentence violated the state statutory maximum of the convicted offense. *Id.* at 304–05. Further, Taylor relies on dicta in *Blakely* which did not address the substantive reasonableness of a sentence but criticized a scenario where a trial judge "increase[d] the punishment" based on post-conviction findings. *Id.* at 306. There, the Court described a defendant convicted of possessing a firearm as a felon, but sentenced for a murder, as an "absurd result." *Id.* Taylor contends he is similarly situated. Not so. Here, after a thorough discussion and consideration of the § 3553(a) factors, the district court sentenced Taylor within the statutory maximum and Guidelines range for a felon in possession violation. So, we disagree that the hypothetical from *Blakely* would apply here.

Last, Taylor argues the "extreme" factual separation between the charged and uncharged conduct makes the sentence unreasonable. We considered and rejected this assertion in our discussion of the § 2K2.1 cross-reference as without record support. Notably, the district court found "Taylor's possession of the Glock on September 2nd … [to be] part of the same course of conduct as his possession of the Glock on September 19th." Indeed, the court considered and accepted the government's argument that "Taylor aided and abetted" in a murder during which a participant used the same gun Taylor was later charged with possessing. To the extent Taylor had "advance[] knowledge that firearm would be used," he remained liable for the use of the firearm.

Case: 24-1914     Document: 42     Filed: 12/03/2025     Pages: 22

22                                               No. 24-1914

There is a logical nexus between the sentence Taylor received and the district court's reasons for that sentence. Further, the 15-year sentence did not exceed the statutory maximum for Taylor's § 922(g)(1) conviction. *See* 18 U.S.C. § 924(a)(8). And, as we already concluded, the court properly applied § 2K2.1's cross-reference and § 3C1.2's enhancement, *see supra* §§ II.B–C, so the sentence was within the Guidelines range. *See* U.S.S.G. § 5G1.1(a). In sum, Taylor was properly sentenced under the statute and within the Guidelines, and the court's decision is well within its discretion considering the facts of this case and our precedent.

### III.

The district court did not clearly err in applying the cross-reference for murder under § 2K2.1 or in applying the enhancement for reckless endangerment under § 3C1.2. The court also did not abuse its discretion in imposing a 15-year sentence. For these reasons, we AFFIRM.